# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT

| | |
|---|---|
| RICHARD WEST and JOSEPH BRUYETTE, individually and on behalf of a class of similarly situated persons;<br><br>          Plaintiffs,<br>   v.<br>JENNEY SAMUELSON, Vermont Secretary of Human Services, TODD DALOZ, Vermont Deputy Secretary of Human Services, NICHOLAS DEML, Vermont Department of Corrections Commissioner, MAX TITUS, Vermont Department of Corrections Director of Health Services, in their official capacities, and VITALCORE HEALTH STRATEGIES, LLC,<br><br>          Defendants. | Case No. 2:19-CV-00081 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

II. BACKGROUND...................................................................................................................2

A. The Court has Jurisdiction to Enforce the Settlement Agreement......................................2

B. The Parties Have Unsuccessfully Attempted to Resolve this Dispute Informally
   According to the Terms of the Settlement Agreement .........................................................3

C. Three Provisions of the Settlement Agreement are Principally here at Issue......................3

III. ARGUMENT ........................................................................................................................5

A. Defendants Are in Breach of the Settlement Agreement......................................................5

   1. VT DOC is violating its obligation to treat "especially compromised" patients
   without regard to their length of incarceration. ........................................................ 5

      a. Class member M.T. is "especially compromised" and entitled to treatment under
      the Policy. .................................................................................................... 5

      b. The phrase "especially compromised" encompasses more than a patient's FIB-4
      score or cirrhosis. ......................................................................................... 8

   2. Defendants are violating their obligation to treat Category 2 patients whose "most
   likely" length of incarceration is long enough to complete DAA treatment. ............ 9

      a. All Category 2 Patients must receive an individualized, "most likely" length of
      incarceration estimate for the purpose of establishing DAA eligibility. ............. 9

      b. Defendants have erroneously denied treatment to Category 2 patients M.T. and
      C.C., even though any reasonable estimated length of incarceration assessment
      should have concluded that C.C. and M.T. are likely to remain incarcerated for
      another 4-6 months. ................................................................................... 10

   3. Defendants have failed to provide patient education and linkage to care as required
   by the Policy. ........................................................................................................ 12

      a. Defendants have provided misleading, outdated information to patients who are
      deciding whether to consent to or refuse treatment .......................................... 12

      b. Defendants have failed to educate and refer patients for treatment in the
      community as required by the Policy................................................................. 14

B. Remedies for Defendants' Noncompliance .......................................................................15

IV. CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Jimmo v. Burwell*,
 No. 5:11-CV-17, 2016 WL 4401371 (D. Vt. Aug. 17, 2016) .................................................. 14

*Progressive N. Ins. Co. v. Muller*,
 213 Vt. 145 (2020) ..................................................................................................................... 5

*State v. Philip Morris USA Inc.*,
 183 Vt. 176 (2008) ..................................................................................................................... 5

*Sutton v. Vermont Reg'l Ctr.*,
 212 Vt. 612 (2020) ................................................................................................................ 5, 14

## I. INTRODUCTION

On October 28, 2021, this Court granted final approval of a Settlement Agreement, ECF No. 134, whereby the State of Vermont Department of Corrections ("VT DOC") and its medical provider, VitalCore (collectively, "Defendants") promised to expand access to hepatitis C ("HCV") treatment for incarcerated patients, "subject only to narrow and medically reasonable exceptions," and with treatment guaranteed to "'especially compromised' [patients] with [h]epatitis C, regardless of the exceptions." ECF No. 119 at 2. Yet one year later, some *West* class members who are entitled to lifesaving treatment under Defendants' HCV policy ("the Policy") are still waiting. As these class members get sicker in the face of the Defendants' intransigence, and other systemic shortfalls in Defendants' implementation of their promises are evident, Plaintiffs reluctantly return to this Court to enforce the Settlement Agreement.

Class member M.T. has sought treatment for his chronic HCV from the Defendants for over two years. M.T. frequently experiences symptoms related to his HCV, such as extreme fatigue, jaundice, liver swelling, abdominal pain, vomiting, and edema (swelling) of his ankles and feet. Yet despite Defendants' obligation to treat "especially compromised" class members, M.T. has not received treatment. Another class member, C.C., is past his minimum date of release, has yet to reach his maximum release date, and remains incarcerated for a slew of reasons. For nearly two years, medical providers employed by Defendants have denied C.C. treatment on the documented basis that his "[l]egal status is past minimum release date"—a plain misinterpretation of the Policy Defendants are required to follow per the Settlement Agreement.

Plaintiffs request that the Court enforce the Settlement Agreement by requiring Defendants to: (1) immediately begin class members M.T. and C.C. on DAA treatment; (2) document systemic compliance with the Policy as regards "especially compromised patients";

(3) document systemic compliance with the Policy as regards the required assessment of a patient's likely estimated remaining length of incarceration; (4) document systemic compliance with the Policy's patient education and linkage to care requirements; and (5) extend Defendants' reporting obligation until such time as the Court deems appropriate to ensure compliance.

## II. BACKGROUND

Hepatitis C Virus ("HCV") is a highly communicable disease that scars the liver and can cause, among other things, cancer, portal hypertension, severe pain, and death. Trooskin Decl. ¶¶ 10–12. In addition to harming the liver, HCV can also cause "extrahepatic" effects that impact other parts of the body, including via myocardial infarction, diabetes, decreased cognitive function, fatigue, joint pain, abdominal pain, depression, limb swelling, and various cancers. *Id.* ¶ 16. For approximately ten years, Direct-Acting Antiviral (DAA) therapy has been the standard of care for HCV, replacing prior less effective treatments. *Id.* ¶¶ 21-34. Plaintiffs brought this case in 2019 on behalf of a putative class, challenging the denial of DAA treatment to hundreds of inmates in VT DOC custody with chronic HCV infection. ECF No. 1 at 1. After certifying a class and turning away Defendants' pleading challenges, ECF No. 56, the Court finally approved the Parties' Class Settlement pursuant to Fed. R. Civ. P. 23(e)(2) in October 2021. ECF No. 134.

A. **The Court has Jurisdiction to Enforce the Settlement Agreement**

Under the Settlement Agreement, Defendants agreed to follow VitalCore's January 1, 2021 policy for the treatment of HCV for individuals in VT DOC custody for a period of two years. ECF No. 119 at 2; ECF No. 114-3 § 6. "For the purposes of enforcing the terms of the Settlement Agreement," this Court retained jurisdiction "for proceedings commenced by class counsel for disputes arising on or before January 1, 2023." ECF No. 134 ¶ 2. *See StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 305 (2d Cir. 2014). This Court should apply "the laws of the State of

Vermont" to determine whether there has been a breach. ECF No. 114-3 § 21.

### B. The Parties Have Unsuccessfully Attempted to Resolve this Dispute Informally According to the Terms of the Settlement Agreement

The Settlement Agreement requires the parties to attempt to resolve any disputes arising under the Agreement by "first notify[ing] the other Party of its concerns," and then "attempt[ing] to obtain agreement amongst themselves as to the steps necessary to satisfy the alleged deficiency." *Id.* § 3. If the parties are unable to agree, "either Party may seek to challenge the other Party's compliance" by filing a motion to "seek enforcement of the . . . Settlement Agreement." *Id.* The parties have been engaged in dispute resolution dialogue since shortly after the Court granted final approval. Davies Decl. ¶¶ 47–89. In some instances, the dialogue has been fruitful. Over time, Defendants have shared treatment status updates for specific class members. *Id.* Recently, Defendants responded to Class Counsel's request for more specific monthly data reporting by adding a new row in the monthly data spreadsheet. *Id.* ¶¶ 83–89.

Unfortunately, the parties have not been able to resolve the following issues: (1) treatment of especially compromised individuals; (2) treatment of sentenced inmates who are past their minimum release date; and (3) patient refusals of treatment and information provided to patients by Defendants. Davies Decl. ¶¶ 47–89. Communication between the parties has also not resolved how the policy applies to specific class members M.T. and C.C. *Id.* As the parties have been unable to agree "amongst themselves as to how to satisfy the alleged deficienc[ies]," Plaintiffs now move for enforcement of the Settlement Agreement. ECF No. 114-3 § 3.

### C. Three Provisions of the Settlement Agreement are Principally here at Issue

At the heart of the Settlement Agreement is Defendants' ongoing adherence to VitalCore's Policy. Three key provisions of that Policy are currently at issue. First, Defendants generally consider a sentenced class member's eligibility for treatment based on whether the

3

patient will be incarcerated for another 4-6 months (the time Defendants deem necessary to undergo a full course of treatment followed by confirmation testing). ECF No. 114-4 at 1. However, Defendants are also required to treat "especially compromised" patients regardless of their estimated length of incarceration: "Especially compromised patients, those with decompensated cirrhosis even with short term stays will be referred immediately to UVMMC or Dartmouth-Hitchcock Medical Center for assessment and care. If necessary, follow-up care can continue after patient release." *Id.* at 1–2. The Policy does not explicitly define the phrase "especially compromised." *Id.*[1]

Second, when patients are sentenced and past their minimum release date, but have not yet reached their maximum, the Policy requires Defendants to engage in an individual evaluation of each such patient, as follows:

> [P]atients with remaining sentence lengths that are indeterminant (the minimum date is past, but there is at least 4-6 months remaining to reach the maximum, and specific date of release is unknown) will be individually evaluated to estimate the most likely remaining period of incarceration. This estimation will be made with assistance from the VT DOC classification personnel and case managers who may be familiar with the likely dates of release. Patients deemed to have an estimated sentence length of 4-6 months or longer based on the assessment of VT DOC classification personnel and case managers will be evaluated for treatment of HCV infection.

*Id.* at 2. Under this provision, a patient's status of "past minimum" isn't a sole basis to deny care.

Third, while the Policy does not require Defendants to provide DAA treatment to all pre-trial detainees, it does require Defendants to provide screening, education, and referrals for

---

[1] The term "those with decompensated cirrhosis" should be understood as an additional criterion, rather than definitional. The Policy discusses referral to UVMMC or Dartmouth-Hitchcock Medical Center in a later section: "Patients with FIB-4 >3.25 or clinical evidence of cirrhosis *or other complicating medical conditions* will be referred to UVMMC or Dartmouth-Hitchcock Medical Center, for additional assessment and treatment recommendations as needed." ECF No. 114-4 at 3 (emphasis added). Defendants themselves testified that the definition of "especially compromised" can include HCV related problems in addition to cirrhosis. *See infra* Section III(A)(1)(b). Thus, at a minimum, the Policy recognizes that in addition to a high FIB-4 score or cirrhosis, "other complicating medical conditions" may warrant the escalation of an individual patient's case as "especially compromised."

follow-up care. "All pre-trial detainee populations will be provided 'opt-out' screening for chronic HCV infection. Patients with confirmed infections will receive patient education on reducing transmission to others and a referral for treatment in the community." *Id.* at 2. Defendants are in breach of all three provisions.

### III. ARGUMENT

**A.  Defendants Are in Breach of the Settlement Agreement**

Settlement agreements are interpreted according to general principles of contract law. *State v. Philip Morris USA Inc.*, 183 Vt. 176, 181 (2008). Contractual terms must be accorded their plain meaning, and provisions should be read together and viewed as parts of an integrated whole. *Progressive N. Ins. Co. v. Muller*, 213 Vt. 145, 148 (2020). All contracts carry an implied covenant of good faith and fair dealing. *Sutton v. Vt. Reg'l Ctr.*, 212 Vt. 612, 632 (2020).

Defendants have violated the Settlement Agreement in three principal ways. First, Defendants have failed to treat "especially compromised" patients regardless of length of incarceration. Second, whether through miscommunication or mistake, medical providers working for Defendants have applied the length of incarceration element of the Policy as a *de facto* categorical exclusion from treatment for class members who are beyond their minimum release date. Third, Defendants have not met their obligation to provide "education, and referrals for follow-up care," instead providing severely misleading information to patients that does not reflect the modern standard of care. ECF No. 114-4 at 2.

1. **VT DOC is violating its obligation to treat "especially compromised" patients without regard to their length of incarceration.**

    a. *Class member M.T. is "especially compromised" and entitled to treatment under the Policy.*

Class member M.T. has symptoms related to his chronic HCV that make him "especially compromised." Since his HCV diagnosis more than two years ago, M.T. has experienced

5

periodic episodes of liver swelling, abdominal pain, edema (feet swelling), vomiting bile, jaundice, and fatigue. Davies Decl. ¶¶ 4–22. These symptoms are consistent with M.T.'s HCV. Trooskin Decl. ¶ 74–80. M.T.'s symptoms, which cause him significant ongoing physical problems, could be resolved if he receives DAA treatment. *Id.* ¶¶ 78–80.

In July 2021, when M.T. reported swollen feet and asked for treatment, medical providers recognized that M.T.'s symptoms could likely be related to his HCV. Trooskin Decl. Ex. C, at 7. But this observation did not lead to treatment. Instead, updates regarding M.T.'s HCV treatment eligibility in his medical file have repeatedly referenced *only* two factors: M.T.'s "Low FIB-4" score and M.T.'s "legal status" of "past min" release date. *Id.* at 18.

An HCV Treatment Note dated September 13, 2022 illustrates the way M.T.'s eligibility for treatment has been considered by medical providers over time. *Id.* The Treatment Note indicates M.T.'s "Anticipated Min & Max Dates," lists his FIB-4 and other medical test results over time, and includes brief notes by attending providers going back to September 17, 2021. *Id.* These notes are remarkably similar. They make no mention of M.T.'s reported symptoms and justify M.T.'s ineligibility for treatment based only on his "Low FIB-4 with legal status of Past Min" (Sept. 17, 2021), or his "improved" FIB-4 score "and legal status remains Past Min" (Feb. 17, 2022). *Id.* Most recently, on September 13, 2022, the attending provider once more concluded M.T. wasn't eligible for treatment, because his "FIB-4 score remains low and continues to improve. Legal Status at this time is past minimum release date." *Id.*

When M.T.'s treatment was raised with counsel in an attempt to resolve this issue prior to motion practice, Defendants doubled down. "[M.T.] has a low FIB-4 score and his liver is doing well." Davies Decl. ¶ 79. But M.T.'s recent symptoms, which include pain near his liver, vomiting bile, and jaundice, raise doubts about his liver health—doubts that cannot be allayed by

6

looking at M.T.'s FIB-4 score out of context. *See* Trooskin Decl. ¶¶ 63–69. M.T. is only 24 years old, which means his relatively low FIB-4 score may less accurately reflect the progression of his disease than it would for someone aged 35 or older. Trooskin Decl. ¶¶ 68–69. Furthermore, a person's liver health alone is not the sole measurement of the gravity of their HCV infection. *Id.* ¶ 61–70. The entirety of a patient's symptoms—including extrahepatic effects, comorbidities, and self-reported experience of the virus—must be considered. *Id.* ¶¶ 61, 73. M.T. has also experienced periodic extrahepatic effects, such as edema and extreme fatigue. *See* Trooskin Decl. ¶¶ 16–20, 74–80; Davies Decl. ¶¶ 13, 21–22.

Even putting aside the inappropriate nature of treating personnel importing independent determinations related to M.T.'s length of incarceration into their medical planning (discussed below), the need to consider *all* of a patient's symptoms is the very reason Defendants' Policy contains an "especially compromised" exception. Defendants' prior policy regarding HCV was built on the (now obsolete) understanding that withholding treatment on the basis of a patient's level of liver scarring was appropriate. ECF No. 31-8. But M.T.'s case is plainly different. Low FIB-4 score notwithstanding *M.T. is currently suffering from significant symptoms of HCV*, rendering him "especially compromised," and entitled to treatment under the Policy.[2]

---

[2] On September 24, 2021, Defendants imposed an additional barrier to care, when medical personnel informed M.T. that he was required "to be vaccinated for Hep B before starting Hep C treatment." Davies Decl. ¶ 16. Not only is this requirement contained nowhere in Defendants' Policy, a patient's vaccination status has no bearing on whether HCV treatment is appropriate. Trooskin Decl. ¶¶ 50–51. When Class Counsel raised this issue, Counsel for VitalCore agreed that "[r]eceiving [the hepatitis B] vaccine is not a pre-requisite for receiving HCV [treatment.]" Davies Decl. Ex. H at 2. Instead of rooting out the source of this barrier, the burden was shifted to M.T. "It is unclear why [M.T.] understood the Hepatitis B vaccine to be a pre-requisite for HCV treatment, but if he has concerns about this, [M.T.] can speak to medical staff for clarification." *Id.*

7

> b. *The phrase "especially compromised" encompasses more than a patient's FIB-4 score or cirrhosis.*

There is no need to speculate about the definition of "especially compromised," because the record establishes it. According to deposition testimony of Fed. R. Civ. P. 30(b)(6) witness Max Titus, the determination of whether a patient is "especially compromised" requires an evaluation of "the level of severity of [a patient's] disease presentation and/or . . . comorbidities." ECF No. 126-3 at 125:22–22. Defendants have also stated that determinations of a patient's "especially compromised" status should "be [made] by the medical provider, based on their clinical experience." *Id.* at 126:6–9. This is consistent with the reality that physicians may consider many clinical factors when evaluating the severity of a patient's HCV infection, including "liver damage and scarring (fibrosis), extrahepatic effects, comorbidities, and self-reported experience of the virus." Trooskin Decl. ¶ 61. An appropriate application of Defendants' policy to M.T.'s case would have allowed the medical personnel treating M.T. to evaluate his health in light of all his clinical symptoms, not just his FIB-4 score.

Instead, the repeated emphasis by medical providers that M.T.'s "FIB-4 score remains low," and that he is "past minimum release date," suggests that VitalCore medical personnel may not be aware the Policy *requires* them to consider clinical symptoms other than a patient's FIB-4 score when evaluating a patient's eligibility for treatment. Further, references to patients' "minimum release date" as a treatment criterion reflected in medical records suggest a basic misunderstanding that VT DOC, *not* VitalCore, has the independent task of estimating a patient's remaining length of incarceration.[3]

---

[3] The Settlement Agreement places the responsibility for these determinations on "VT DOC classification personnel and case managers who may be familiar with the likely dates of release." ECF No. 114-4 at 2.

**2. Defendants are violating their obligation to treat Category 2 patients whose "most likely" length of incarceration is long enough to complete DAA treatment.**

Both M.T. and C.C. have been incarcerated since before the Policy came into effect nearly two years ago. Davies Decl. ¶¶ 4–9, 23–27. Both are "Category 2" patients with "remaining sentence lengths indetermina[te]," and thus receive a monthly individualized assessment of their remaining "length of stay" in VT DOC custody to determine their eligibility for treatment. *Id.* ¶¶ 5, 24. In addition to the sentences they are currently serving, both patients are also "detained" pending additional unresolved felony charges, making it extraordinarily unlikely they will be released in the next 4-6 months. *Id.* ¶¶ 8–9, 27. Although Defendants have received specific notice of both M.T. and C.C.'s circumstances repeatedly—starting before this Court granted final approval of the settlement—Defendants continue to withhold treatment. Any reasonable estimate of their remaining length of incarceration would entitle them to treatment under the policy. Assuming that Defendants have been conducting "most likely" monthly individualized assessments for M.T. and C.C. since the Policy went into effect, these monthly assessments have been wrong for *22 months in a row*.

    a. *All Category 2 Patients must receive an individualized, "most likely" length of incarceration estimate for the purpose of establishing DAA eligibility.*

Defendants' Policy states as follows: Category 2 "patients with remaining sentence lengths that are indetermina[te] (the minimum date is past, but there is at least 4-6 months remaining to reach the maximum, and specific date of release is unknown) *will be individually evaluated* to estimate the *most likely* remaining period of incarceration." ECF No. 114-4 at 2 (emphasis added). The Policy acknowledges that not all patients will have a certain or exact known release date, and that an "estimate" is required to determine someone's "most likely" remaining length of incarceration. Defendants generate an individualized "most likely" length of incarceration estimate for each patient every month. *Id.* at 3; ECF No. 126 at 18. The Policy

9

requires Defendants to calculate a good faith *"most likely remaining"* sentence assessment for each patient, and treat those for whom the estimate is 4 – 6 months or longer. *Id.* To assess a patient's remaining length of incarceration, Defendants consider patients' "minimum and maximum" release date, "the requirements for [their] release into the community," and "the nature [of each patient's] case." ECF No. 126-3 at 152:17–153:6. This may include factors "including, but not limited to: the court system, State's Attorneys, defense counsel, bail, [trial] scheduling, plea deals, and judicial rulings." Davies Decl. ¶ 69.

> b. *Defendants have erroneously denied treatment to Category 2 patients M.T. and C.C., even though any reasonable estimated length of incarceration assessment should have concluded that C.C. and M.T. are likely to remain incarcerated for another 4-6 months.*

As a sentenced inmate who is past his minimum release date, with approximately 17 months left to reach his maximum, M.T. is a "Category 2" patient. Davies Decl. ¶ 7. As such, M.T. would be eligible for immediate treatment if his estimated length of incarceration were calculated to be 4–6 months. Instead, over a period of more than two years, M.T. has been repeatedly denied treatment. Trooskin Decl. Ex. C. Defendants have suggested M.T.'s estimated remaining length of incarceration is "unknown" due to factors relating to a pending felony charge that has been pending in Vermont state court since May 2021, and a "hold" for charges in another state. Davies Decl. ¶¶ 8–9, 79. But M.T.'s felony charge has been pending since before this Court approved the settlement agreement (in October 2021), and the out-of-state "hold" makes the possibility of M.T.'s imminent release within 4-6 months highly unlikely. Davies Decl. ¶ 4–9; *see also* ECF 126 at 13 (discussing M.T. as a class member whose release date was "indeterminate"). Furthermore, medical personnel have repeatedly denied M.T. care based on his "past min" status, *not* based on the individualized assessment of his likely remaining length of incarceration, as discussed *supra* Section III(A)(1)(a).

10

Another Category 2 patient, C.C., presents a similar case. C.C. has a diagnosis of chronic HCV. Davies Decl. ¶ 23. C.C. is a sentenced inmate past his minimum release date, with his maximum approximately 18 months away. *Id*. ¶ 24. C.C. has had one additional charge pending in state criminal court since January 2021. *Id.* ¶ 27. C.C. has requested treatment repeatedly since the new Policy went into effect. *Id*. ¶ 29. In April 2021, C.C. was referred to the medical provider after "asking to be treated for HEP C." *Id.* ¶ 30. The attending provider attempted to order a full course of DAA treatment for C.C., but this clinical decision was rejected. *Id.* If a reasonable individualized estimation of C.C.'s remaining length of incarceration had been performed in April 2021, when the clinical decision to order DAA treatment for C.C. was overturned, C.C. could have completed a six-month course of DAA treatment three times over. Instead, attending providers continued to deny treatment to C.C. on June 15, 2021, February 1, 2022, and on July 14, 2022, simply because his "Legal status is past min." *Id.* ¶¶ 31–40.

A Category 2 patient's "past min" status, standing alone, is not a basis to deny care under the Policy—but M.T. and C.C.'s medical files indicate that providers are doing exactly that. This raises a systemic question whether VitalCore's medical personnel have received appropriate or adequate training about how to obtain or interpret "length of stay" assessments, or how these assessments are supposed to factor into treatment decisions for Category 2 patients.[4]

---

[4] Defendants' claim that C.C. and M.T. could be released imminently due to the complexities of their pending criminal charges is belied by the many months that have passed in the meantime. To the extent that the Policy permits Defendants to conclude, on a month-to-month basis, that a particular inmate's most likely estimated length of incarceration is "unknown," this should be seen as an exception to the rule. The Policy should not be read to allow Defendants to knowingly deny treatment for *years* at a time simply because the state court system hasn't moved a case forward quickly enough, especially if a prisoner is "held" for charges pending in another state.

11

3.  **Defendants have failed to provide patient education and linkage to care as required by the Policy.**

    a. *Defendants have provided misleading, outdated information to patients who are deciding whether to consent to or refuse treatment*

The Settlement Agreement requires "[a]ll patients with chronic HCV" who are deemed eligible for treatment to be "treated as soon as possible if the course of treatment can be completed during confinement." ECF No. 114-4, at 1. Yet despite the safety and efficacy of DAA treatment, monthly reporting from VT DOC shows a shockingly high number of "patient refusals" of treatment. For example, in May 2022, out of a total of 145 patients known to have HCV, 19 patients were not approved for treatment because "patient refused," while only 4 were listed as actually undergoing treatment ("engaged in DAA"). Davies Decl. Ex. U. In other words, in May 2022, 13% of patients with HCV were not approved for treatment because "patient refused," while only 2% were actually receiving treatment.[5] These numbers vary slightly from month to month, but the high proportion of treatment refusals has remained fairly static.[6]

The high number of refusals may be partly explained by Defendants' inexplicable decision, apparently throughout the settlement period, to provide patients with outdated and misleading information regarding the safety and efficacy of HCV treatment. According to communications between Class Counsel and Defendants, "[i]f an individual refuses treatment, VitalCore educates the individual about the risks of that decision" by providing them two informational pamphlets: (1) a two-sided Handout titled "Hepatitis C," and (2) a longer booklet titled "Living with Hep C." Davies Decl. ¶¶ 71–73; Trooskin Decl. Exs. A, B. The "Hepatitis C" Handout, in particular, contains information that is severely outdated and conflicts with the

---

[5] In the same month, 12 additional patients (8%) were "approved for DAA" but had not yet commenced treatment. Davies Decl. Ex. U.
[6] The number of patients listed as "not approved – PT refused" has gone as high as 22 patients (April 2021) and has never dropped lower than 14 patients (January 2021, December 2021).

current standard of care. Trooskin Decl. ¶¶ 46. In relevant part, the Handout reads as follows:

> There are treatments to get rid of HCV, but they don't work for everyone, and some people don't need treatment. Treatment . . . depends on several factors, such as how advanced the disease is, lifestyle behaviors (such as drug and alcohol use), mental health status, and age.
>
> Talk with the healthcare provider about whether you need treatment. The medications approved to treat HCV include:
> - Interferon - a medicine that you inject under the skin to fight HCV
> - Pegylated interferon – another type of interferon that lasts longer in the body and may work[] better
> - Ribaviran – a pill that helps fight HCV when used with interferon[.]

Trooskin Decl. Ex. A. The information contained in the Handout is at least eight years out of date and highly misleading. *Id.* ¶¶ 39–48. Treatment with Interferon or Ribavirin—treatments with a high risk of dangerous side effects—is no longer the standard of care and has not been for at least eight years. *Id*. ¶¶ 22, 42. The Handout makes no mention at all of the existence of DAA treatment, even though DAAs are the modern standard of care for HCV.[7] *Id.* And contrary to the Handout's assertion that "some people don't need treatment," it is the standard of care for *all* patients with HCV to be treated immediately without regard for the inaccurate and outdated factors listed, with only a *de minimis* exception not here at issue. *Id.* ¶ 44.

Upon learning of the Handout, Class Counsel immediately raised their concerns with Defendants. In response, Defendants indicated that VitalCore is "working . . . to discover the origins of the pamphlet in question as it is not a VitalCore document," and "trying to determine whether the pamphlet can be updated and/or taken out of circulation as an educational tool. We are also looking into whether there is a better pamphlet that can be used." Davies Decl. ¶¶ 79. Defendants do not deny that the pamphlet has been circulated to class members. *Id.*

By giving patients false, out of date, and misleading information about HCV treatment

---

[7] Indeed, Defendants' own Policy provides *only* for the provision of DAA regimens (Mavyret and Epclusa). ECF No. 114-4 at 3.

options, VT DOC denies them the opportunity to engage in a process of informed consent regarding their own medical care—clearly violating the spirit of the settlement agreement. Trooskin Decl. ¶¶ 35–38; *Jimmo v. Burwell*, No. 5:11-CV-17, 2016 WL 4401371 at *10–11 (D. Vt. Aug. 17, 2016) (promulgation of misleading information violated the spirit of a settlement agreement); *Sutton*, 212 Vt. at 632 (2020) (noting that good faith requires that a party "not . . . do anything to undermine . . . the other's rights to receive the benefits of the agreement").

> b. *Defendants have failed to educate and refer patients for treatment in the community as required by the Policy.*

Defendants are required to provide patients in the "pre-trial detainee population" with "screening, education, and referrals," including "patient education on reducing transmission to others and a referral for treatment in the community" upon release. ECF No. 114-4, at 3. This reflects the standard of care that upon release, "patients should be provided linkage to community healthcare for surveillance for HCV-related complications." Trooskin Decl. ¶ 52. Defendants have failed to identify a program to connect class members to care on release.

Defendants have stated, "if the individ[u]al has a community health provider, VitalCore can coordinate . . . to help schedule the individual an appointment upon release," and "[i]f the individual does not [have one] then the individual is told they can seek treatment at [UVMC] or provided the contact information for [VCCI]." Davies Decl. ¶ 79. However, simply telling an individual that they *can* seek care without taking further steps to simplify or facilitate the process is not sufficient to carry out the directive of the Policy.[8] Defendants must take some affirmative step to provide "patient education," ECF 114-4 at 3, that is current and accurate, and set up an administrative procedure to ensure all patients actually receive a referral for community care.

---

[8] Class Counsel's communications with class member S.P., a Category 2 patient, indicate that he did not receive any HCV educational information or a community referral upon discharge. Davies Decl. ¶¶ 41–46.

14

B. **Remedies for Defendants' Noncompliance**

The Court should exercise its supervisory authority over the Settlement Agreement and require Defendants to address and correct these deficiencies. In order to ensure Defendants' compliance with the existing terms of the Settlement Agreement, the Court should provide the following relief, along with any other such relief the Court deems appropriate.

The Court should require Defendants to begin M.T. and C.C. on DAA treatment immediately. The Court should require Defendants to provide individual length of incarceration assessments—and treatment, if appropriate—for the 15 patients who have been identified as "Sentenced/Post minimum" in Defendants' most recent data reporting. *See* Davies Decl. Ex. U at 1. The Court should require Defendants to articulate a more transparent process for assessing patients' "most likely" remaining length of incarceration. The Court should require Defendants to educate their medical personnel in the VT DOC system about the Policy, clarifying the appropriate application of a patient's estimated length of incarceration to treatment decisions, and clarifying that patients may be "especially compromised" and entitled to treatment on the basis of more than just a FIB-4 score. The Court should require Defendants to remove the old HCV pamphlets from circulation and provide new and accurate information to patients about treatment options and linkage to care upon release. The Court should require Defendants to document their compliance with these requirements with Class Counsel. Finally, the Court should require Defendants to memorialize their compliance prospectively and extend Defendants' reporting obligation until such time as the Court deems appropriate.

**IV. CONCLUSION**

For the reasons stated, the Court should grant Plaintiffs' Motion to Enforce the Settlement Agreement and order appropriate relief.

Respectfully submitted, this the 28th day of October, 2022.

/s/ *Suzanne Davies*

Suzanne Davies (admitted *pro hac vice*)
Kevin Costello (admitted *pro hac vice*)
Center for Health Law & Policy Innovation
Harvard Law School
1585 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-0901
sudavies@law.harvard.edu
kcostello@law.harvard.edu


Lia Ernst
ACLU Foundation of Vermont
90 Main Street, Suite 200
Montpelier, VT 05602
(802) 223-6304
lernst@acluvt.org


James Valente
Costello, Valente & Gentry, P.C.
51 Putney Road
Brattleboro, VT 05301
(802) 257-5533
valente@cvglawoffice.com

*Attorneys for Plaintiffs and Class*